UNITED STATES of America ex rel.
Ronald X. BOELTER

v.

Julius T. CUYLER, Superintendent at State Correctional Institution, Graterford and District Attorney of Philadelphia County.

Civ. A. No. 75–3611.

United States District Court,
E. D. Pennsylvania.

Feb. 29, 1980.

Joseph A. Torregrossa, Morgan, Lewis & Bockius, Philadelphia, Pa., for plaintiff.

Michael F. Henry, Asst. Dist. Atty., Chief, Motions Division, Philadelphia, Pa., for defendant.

## OPINION

EDWARD R. BECKER, District Judge.

### I. *PRELIMINARY STATEMENT*

This decision marks the end of this Court's lengthy consideration of the habeas corpus petition filed by relator, Ronald X. Boelter, in 1975. The history of this case, however, begins on January 4, 1971, when a group of eight men, posing as customers, entered Dubrow's furniture 'store in Philadelphia, singly and in pairs. After all eight were in the store, they pulled guns and announced a robbery. In the course of the robbery, the employees were tied up and terrorized; several were kicked or pistol-whipped. The robbers also poured gasoline and set fires in several places throughout the store; one of these fires was set directly on one of the employees. Three of the employees were shot, one of them fatally.

Four days later, on January 8, 1971, Boelter was arrested in connection with the crime. After a series of delays which will be described later in this opinion, Boelter was brought to trial in February, 1973. A mistrial was declared when the jury was unable to agree on a verdict, and at his second trial in July, 1973, Boelter was convicted of first-degree murder. Relator's post-trial motions, which raised the same eight grounds as are raised in his habeas corpus petition,[1] were denied, and his con-

---

1. The grounds for relief are:
   (a) Denial of a speedy trial.

(b) Double jeopardy, in that his first trial was aborted prematurely when the jury could not agree on a verdict.

viction and sentence of life imprisonment were affirmed by the Pennsylvania Supreme Court, three members voting to remand for an evidentiary hearing on whether Boelter had been denied a speedy trial. *Commonwealth v. Boelter*, 463 Pa. 162, 344 A.2d 475 (1975). He then petitioned for federal habeas corpus relief. In a Memorandum and Order issued October 6, 1976, we approved the recommendation of United States Magistrate Edwin E. Naythons that we reject seven of the eight grounds, and appointed counsel to brief and argue on Boelter's behalf his claim that he had been denied the constitutionally guaranteed right to confront adverse witnesses. Subsequently, relator's counsel persuaded us to allow briefing and argument of the speedy trial issue as well. Because an evidentiary hearing was necessary for the proper resolution of these two claims, a three-day hearing was held. For the reasons that follow, we now·decide those issues adversely to relator.[2]

## II. THE SPEEDY TRIAL CLAIM

### A. FINDINGS OF FACT

On January 8, 1971, four days after the gruesome episode at Dubrow's Furniture Store, relator and several other suspects were arrested by the Philadelphia police. Relator gave a statement to the police in which he alleged that he was at home at the time of the Dubrow's robbery—2:00 p. m.—and that several persons, including his mother, his sister, and one Daniel Flood—who, relator said was about 40 years old and lived on the third floor of the house in which relator and his family also lived—could verify his whereabouts at the critical time.

That evening lineups were held at the Philadelphia Police Administration Building. Relator was represented at the lineup by Nino V. Tinari, Esquire. There were four lineups, each of which contained one suspect and five other persons; each was viewed by a number of witnesses to the Dubrow's incident. Several of the witnesses identified relator, with varying degrees of certainty. *See* Findings of Fact *infra* on relator's confrontation claim.

Also that evening of January 8, two Philadelphia detectives went to relator's home on Gratz Street in search of the asserted alibi witnesses. An interview sheet made at the time indicates that one Ronald Flood, age 21 years, and living on the third floor of · relator's house, told the detectives that on the crucial day he remembers that relator left the house at about 9:00 a. m.—not at 4:00 p. m. as relator alleged. The detective who testified at the habeas corpus hearing before this Court had no independent recol-

---

(c) Refusal to authorize appointed counsel to hire a private polygrapher.

(d) Denial of relief under either the "Two-Term Rule" (19 Pa.Stat. § 781) or the "180-Day Rule" (19 Pa.Stat. § 882).

(e) Failure to answer or rule on all pretrial motions filed by defendant.

(f) Prejudicial conduct of the prosecutor.

(g) Bias of the trial judge.

(h) Denial of confrontation through limitation of defense counsel's cross-examination of the police officer who conducted the line ups.

**2.** We have had this matter under advisement for much too long. Our inability to dispose of the case is due to the fact that after assignment to our docket of M.D.L. 189, the Japanese Electronics Products Antitrust Litigation, one of the most massive antitrust cases ever brought, we have had to spend half our time on that case. To manage a full calendar on the time we have had left has been a most difficult undertaking and has left us too little time to complete opinions in pending cases, particularly in involved matters such as this one.

We have carefully examined the post-trial path of Boelter's efforts to win relief from his conviction, and find that he has satisfied the statutory requirement that state remedies be exhausted before a federal court may consider a § 2254 habeas petition. Even as to the confrontation claim, which is the subject of the "waiver" and "bypass" discussion *infra*, there has clearly been exhaustion. Relator presented this claim in post-trial motions and to the state supreme court on appeal. We do not doubt that state post-conviction relief would be denied, either on the ground that the issue had been "finally litigated" or that it had been "waived." *See* 19 Pa.Stat. §§ 1180–3(d), 1180–4(a)(b). Therefore, there is no procedural barrier to our consideration of the merits of these claims.

lection of Mr. Flood, and testified that, at this late date, he would not know if the age and first name on the interview sheet were at variance with Mr. Flood's true age and name.

We make no finding as to the exact age or first name of Mr. Flood, because no such finding is necessary. We do find, however, that the Mr. Flood interviewed by the Philadelphia police was the only Mr. Flood then residing at the Gratz Street address, for there is no evidence that there was more than one person by that name living there. We further find that this Mr. Flood, whose account of the critical day's events as given to the police did not corroborate relator's asserted alibi, moved from the Gratz Street house approximately one month after relator's arrest and that neither the district attorney nor the defense counsel were able subsequently to locate him.

Relator's preliminary hearing was originally scheduled for January 13, 1971, but was continued until January 27 at the request of Mr. Tinari. Mr. Tinari at this time was privately retained to represent relator as well as relator's codefendant, Edward Sistrunk. After the preliminary hearing, fee problems developed between Mr. Tinari and relator's family. These fee problems eventually resulted in Mr. Tinari's withdrawal as private counsel from relator's case—though not from that of Mr. Sistrunk. However, as is noted below, Mr. Tinari was thereafter appointed by the court to represent Boelter.

The first court listing in relator's case was March 29, 1971, in the homicide calendar room at Philadelphia City Hall. We pause at this point in our chronicle to provide some background in the operations of the Philadelphia Court of Common Pleas circa 1971–72 as they relate to homicide cases. Homicide cases were segregated from all other felony matters and had their own calendar. Approximately six to eight judges were assigned to the Homicide Division, and these judges heard nothing but homicides. The system disposed of about 500 homicide cases in a year, but ran a continual backlog of between 300 and 350 cases. Of these backlogged cases, about 200 were jury cases, the others being pleas or waivers of jury trials. At any one time no more than five homicide judges were available to hear jury trials. One homicide judge was in charge of the calendar room and did not actually conduct trials and two of the eight homicide judges would hear "waiver" cases. All homicide cases were initially listed for hearing before the calendar judge. A listing before the calendar judge was not a trial date, but was a conference designed to determine the status of the case and to attempt to resolve any problems that existed in bringing the case to trial. Thus, relator's March 29 listing was not a trial date.

Homicide trials averaged about three weeks in length, inclusive of pending motions and jury selection, but attorney conflicts, illnesses, etc. made it impossible for any judge to actually average one complete trial every three weeks. There was a general policy to try older cases before newer ones, but the vagaries of courtroom and attorney availability made the policy an unattained goal. These scheduling difficulties meant that the 200 or so cases backed up in the jury pool were commonly backlogged anywhere from one to three years.

From this jury pool of about 200 or more cases, cases would move into the ready pool, when both the defense attorney and the Commonwealth indicated they were ready to proceed. The ready pool usually consisted of between 20 and 30 cases, and ideally (if not really) would consist of the 20 or 30 oldest cases in the jury pool. The ready pool signified to attorneys that the case could come up on two weeks notice. This did not mean that the case would come up in two weeks, but that counsel were to be prepared to go to trial two weeks from notification. As a further refinement, two or three cases out of the ready pool would be backed up on the calendar of each homicide jury trial judge. Thus, at least in theory, an attorney could follow the progress of the one or two cases ahead in the courtroom to which his case was assigned and gauge when his case was likely

to come up. Of course, sudden guilty pleas or other surprises, compounded by attorney conflicts, could wreak havoc with the schedule.[3]

At the March 29 calendar listing of relator's case, the case was continued until May 24, 1971. At our habeas corpus hearing, Mr. Tinari testified that this continuance was granted at the request of the Commonwealth and over his objection. Edward Rendell, Esquire, however, now the District Attorney of Philadelphia, and in 1971 and 1972 Assistant District Attorney assigned to the homicide calendar room, testified that Mr. Tinari requested the continuance in order to try to work out his ongoing fee problems with relator's family. We credit Mr. Rendell's testimony, which was supported by that of Edward Attanesio, an employee of the Philadelphia Court of Common Pleas. Mr. Attanesio's job in 1971 and 1972 was to make records of listings in the homicide calendar room to provide a short running history of each case. Mr. Attanesio's records of the March 29, 1971 listing show that the case was continued to May 24 "at request of counsel." Mr. Attanesio testified that "counsel" meant defense counsel; he referred in his records to the District Attorney as "district attorney," not as "counsel." We thus find that the March 29 continuance was at the request of Mr. Tinari.

At the May 24, 1971 listing, also in the homicide calendar room, the case was again continued, this time to July 12. Mr. Tinari again testified that the Commonwealth asked for the delay because it wanted to proceed first against relator's co-defendant Edward Sistrunk, against whom it thought it had a stronger case. Mr. Tinari agreed with that evaluation of the relative strength of the two cases, which was why he asserted that he wanted to try Boelter's case first. Mr. Rendell testified that the Commonwealth did, in fact, want to try Sistrunk first,[4] but that the particular reason for the May 24 continuance was that Mr. Tinari's fee problems with relator's family had finally reached a critical point. He testified that Mr. Tinari asked the court for permission to withdraw from the case, and that this request was granted. Mr. Rendell further testified that when counsel withdrew, the ordinary practice was to continue the case for several months to allow time for new counsel to be appointed and to become familiarized with the case. Ordinarily, Mr. Rendell stated, the District Attorney would not know the identity of appointed counsel until the next calendar room listing unless that attorney personally notified the district attorney of his appointment.

Mr. Tinari testified that he never formally withdrew from relator's case, but we credit Mr. Rendell's testimony as to the events of May 24.[5] Moreover, Mr. Attanesio's records again corroborate that testimony, for they indicate that on May 24 "N. Tinari" was "permitted to withdraw," that the calendar room judge administered a pauper's oath to relator, and that new counsel was to be appointed by the court. Additionally, the only calendar room proceeding that was also recorded was the administration of the pauper's oath to relator.[6] Finally, we have the certificate of appointment

3. The situation in Pennsylvania has since been considerably ameliorated by introduction of a 180-day rule for the trial of criminal cases in Common Pleas Court and by the creation of additional judgeships (there are now fourteen judges assigned to the homicide program, whereas there were only eight in the period critical to this case).

4. Existing law prohibited the state from trying two homicide codefendants together in the same trial.

5. We did not find Mr. Tinari to be a credible witness. In part, that credibility finding is a function of our impression that Mr. Tinari's testimony was self-serving. For the reasons detailed *infra* we consider Mr. Tinari's professional conduct in connection with his representation of relator to have been reprehensible. We believe that Mr. Tinari also tried, to the extent that he could, to be helpful to relator in this proceeding.

6. Our findings of fact on what at several points comes down to a swearing contest were handicapped by the unfortunate paucity of the transcribed proceedings.

showing that on May 28, 1971, Nino Tinari was appointed by the court to represent relator, apparently because of his familiarity with the case. Apparently Mr. Rendell did not discover until the July 12, 1971, calendar listing that Mr. Tinari was still on relator's case, and so he had no reason to accelerate its scheduling. In any event, we find that the continuance of relator's case on May 24, 1971 was due to Mr. Tinari's withdrawal because of fee problems.

On July 12, 1971, relator's case was again continued, this time to October 1, 1971. Mr. Tinari claimed that the continuance was due to the Commonwealth's desire to proceed against Sistrunk first, and that he opposed the delay. Mr. Attanesio's records show that the continuance was because of "new counsel." Mr. Attanesio said that this meant new counsel had not yet been appointed. However, Mr. Tinari was in fact appointed in May. Mr. Rendell did not testify concerning this continuance specifically but his general testimony, which we credit, was that at about this time the decision was made, with the assent of the court, to try Sistrunk first, partly because the Commonwealth felt its case against Sistrunk to be stronger, but also because the lapse in relator's representation (at least as far as the district attorney knew) would require delaying the Boelter case. Perhaps that was the meaning of the "new counsel" notation on Mr. Attanesio's record—that new counsel required the delay of relator's case until after his co-defendant's trial from a simple scheduling standpoint. In any event, relator's case was continued until October 1, which would follow the Sistrunk trial, due to take place in September.

On July 22, 1971, Mr. Tinari filed three motions in relator's case: a motion to suppress identifications, a motion for a bill of particulars, and a motion for funds to hire a private investigator. The two motions other than the suppression motion were later dismissed for failure to prosecute when Mr. Tinari failed to appear or file a busy slip

when they were called for argument. The suppression motion remained pending until April, 1972, when Mr. Tinari withdrew it for tactical reasons.

On September 22, 1971, when the Sistrunk case was called to trial, the Commonwealth moved for a continuance because the assistant district attorney assigned to the case was forced to take a vacation for health reasons. For the same health reasons, the case was transferred to another assistant district attorney, Edward Levine, who, because of his recent assignment to the case, was not prepared to go to trial. After some strong words from the court, the Sistrunk trial was continued until October 12 to permit Mr. Levine to prepare, with the understanding that the Boelter trial would shortly follow. Pursuant to this understanding, at the October 1 calendar listing in relator's case, the trial was continued to November 1.

The Sistrunk trial took ten days, not including jury selection, and resulted in Sistrunk's conviction on October 22. Obviously, because Mr. Tinari represented both Mr. Sistrunk and relator, relator could not go to trial during jury selection and trial of the Sistrunk case. On November 1, 1971, relator's case was put in the ready pool.[7]

Mr. Tinari testified that from November 1 on he urged Mr. Rendell weekly to bring the Boelter case to trial. He also testified that although the court itself, and not the district attorney, set trial dates, the district attorney had some "vague" input into those decisions. Mr. Rendell's testimony generally corroborates that to some extent scheduling trials and courtrooms was a joint venture of the calendar room judge and the assistant district attorney. Mr. Rendell, however, testified that Mr. Tinari's "weekly" demands did not begin until after the first of the year (1972), and then were "weekly" only in the sense that they were made on the weeks Mr. Tinari happened to be in City Hall. We credit this testimony, which is supported by the state court rec-

---

7. The Sistrunk case, which was tried to conviction in less than ten months from arrest, found its way through the system very rapidly in relation to the norm. *See* text accompanying note 3, *supra.*

ord. Mr. Rendell further testified, and again we credit his testimony, that when relator's case was put in the ready pool on November 1, 1971, there was simply no chance that it would go to trial in the balance of 1971 for it was the policy of the court not to conduct trials in which there would be a sequestered jury when there was a chance that the trials would run over the Thanksgiving or Christmas holidays. Exclusive of jury selection, the Sistrunk case, which was comparable in scope to relator's, had taken ten days to try. The length of trial time, augmented by jury selection, plus the fact that there was still an outstanding suppression motion that would have to be disposed of before trial,[8] left little chance that the court's own routine scheduling procedures would permit relator's case to be tried in 1971.

Despite Mr. Tinari's requests to Mr. Rendell, relator's case was not called to trial in the first three months of 1972. This delay was due to scheduling difficulties because of other backed up cases and unavailable courtrooms. The Boelter case was at this time only one year old, and there were other, much older cases also in the ready pool at this time. Because it was the policy of the court to try older cases first whenever possible, available courtrooms went to other cases. Additionally, it appears that Mr. Levine, the assistant district attorney to whom this case was assigned, was on vacation for several weeks during this period. The Boelter case was finally called to trial in April, 1972. The Commonwealth was ready, but Mr. Tinari was conducting two consecutive trials in federal court. Thus, but for conflicts in defense counsel's schedule, relator would have gone to trial in April 1972. Relator's trial was thereupon moved back to May, 1972, to wait for Mr. Tinari.

On May 3, 1972, with trial at last ready to begin, Mr. Tinari informed the court that Mr. Boelter was dissatisfied with his representation because he had not spoken to his client since the night of the lineups some 16 months earlier, despite repeated letters asking Mr. Tinari to come speak to him and to get the trial moving. Mr. Tinari also informed the court that Mr. Boelter claimed to have an alibi defense of which he previously was unaware and the details of which Mr. Boelter would not tell him. This, we note, was despite the fact that relator's statement to the police on the night of the arrest contained the alibi information now considered to be so crucial and that in his petition for allowance of a private investigator Mr. Tinari alleged that he had interviewed Mr. Boelter and begun his investigation.

On the other hand, athough relator testified that he had written to Mr. Tinari about 12 times, he apparently never contacted the court about his representation problems and his dissatisfaction with his attorney; the state court records make it clear that May 3, 1972 was the first the court knew of the situation. Mr. Tinari maintained—at least until he learned of the alleged alibi—that he was prepared to go ahead with the Boelter trial despite not having met with his client since the lineups some 16 months earlier because he had been involved in the Sistrunk and Boelter matters from the beginning, had tried the Sistrunk case, which arose out of the same robbery, and felt that the two cases were essentially the same. Thus, he argued, his preparation for Sistrunk was directly transferable to Boelter. However, Mr. Rendell, aware of the vulnerability on appeal of any conviction that might result were a trial immediately conducted under circumstances where the entire attorney-client contact over 16 months was so sparse and where the defendant was

---

8. Motions were not heard before the calendar judge or, in the ordinary course, before the trial judge to whom the case was eventually assigned. Rather, motions were assigned to "motions court" and heard before judges whose job it was to decide motions only. Motions from one case might get split up and assigned to different motions judges. With calendar listings in one courtroom, and motions in others, scheduling conflicts sometimes made attendance by attorneys a problem. See text accompanying note 11, infra. Any motions in a particular case that were still undecided when a case was called for trial were consolidated before the trial judge and decided immediately before the trial's commencement.

obviously dissatisfied with his representation, urged the court to grant a two-week continuance to allow Mr. Tinari to prepare his case. Understandably outraged at Mr. Tinari's behavior and apparently not eager to impose an unwanted attorney upon the defendant, the court declined to follow Mr. Rendell's suggestion and instead removed Mr. Tinari from the case, fined him $1,000,[9] and referred the matter to the bar association disciplinary board. Thus was relator's case delayed again.

Summing up the 16 months of the Tinari representation, we find that relator and his counsel must bear primary responsibility for the bulk of the time in which the case did not come to trial. During the first six months of the action's pendency, unpreparedness of defense counsel and fee disputes forestalled moving the case forward; the last month of this period saw no trial because of Mr. Tinari's unavailability. Additionally, because Mr. Tinari represented both relator and his co-defendant Sistrunk, Mr. Tinari was, obviously, unavailable while the Sistrunk trial was proceeding. Between jury selection and actual trial, much of October, 1971 was thus lost as far as trying relator goes. Furthermore, the positions of defense counsel and relator necessitated appointment of new counsel and further delay of the case while new counsel became familiar with the matter. Thus, the delay from Mr. Tinari's removal to the first calendar listing following the appointment of new counsel—from May 3, 1972 to June 12, 1972 can hardly be charged to the Commonwealth.

Turning to the remaining delay, by far the bulk of it was due to scheduling difficulties created by crowded dockets and the court policy of not scheduling trials with sequestered juries when the Thanksgiving and Christmas holidays drew near. About three weeks was directly attributable to

district attorney unpreparedness for the Sistrunk trial, which necessitated moving relator's case back also. This delay may, in turn, have been responsible for putting relator's case into the holiday period, thus triggering another two-month delay.

On May 4, 1972, Joel Moldovsky, Esquire, was appointed by the court to take up relator's representation with the understanding that Mr. Moldovsky would not ask for any continuances. Mr. Moldovsky interviewed relator at prison for 3½ hours on May 6, and on May 10 obtained a trial date for June 12. On May 23, Mr. Moldovsky filed motions for suppression of identifications and other evidence, for a bill of particulars, and for funds to hire a private investigator.

On June 9 the June 12 trial date was continued to July 14.[10] On July 13 it was continued to September 18. On September 25 it was continued to October 19. From October 19 it was continued to November 15. Mr. Moldovsky claims that on each of these occasions the delay was due to the fact that the Commonwealth was unprepared. This usually manifested itself in Mr. Levine, to whom the Boelter case was assigned, being absent and the District Attorney's office arguing that only Mr. Levine could handle the case. Mr. Rendell testified that sometime in the summer of 1972 Mr. Levine did in fact take a vacation, to which he was eminently entitled because of the volume of courtroom work each assistant district attorney was required to carry. Mr. Rendell also pointed out that because the District Attorney's office was understaffed, an assistant district attorney might well be conducting one trial when another trial was called. This, of course, would result in the assistant being "unavailable" and the Commonwealth being "unprepared."[11] Mr. Rendell testified that the district attorney's office wanted one trial assistant to follow an important case like relator's through, and so did not have alternates attempt to

---

9. For some reason, the fine was later remitted.

10. There is some dispute as to whether the case in fact ever left the ready pool. Whether it was removed from the pool upon the removal of Mr. Tinari and then was immediately returned to

the pool when Mr. Moldovsky entered the case or whether the case never left the ready pool is unimportant to our findings.

11. See note 8, supra.

argue motions or try cases for the unavailable assistant district attorney. Mr. Rendell, however, pointed out that the court generally accorded defense counsel as well as the district attorney the privilege of having one attorney follow a case through, for it was beneficial to neither the Commonwealth, the defendant, nor the court for alternates unfamiliar with the case to argue or try them. Thus, continuances for attorney unavailability were not uncommon.

Mr. Rendell also claims that in September or October of 1972, Mr. Moldovsky had a gall bladder operation and had requested that all his trials be continued for about 6 weeks. Mr. Moldovsky admitted the operation, but denied that it prompted him to request any continuances.[12] Finally, Mr. Rendell testified that beyond Mr. Levine's vacation and Mr. Moldovsky's gall bladder operation, whatever remaining delay existed was caused by simple overcrowding of the docket. We credit Mr. Rendell's testimony as to the causes for the continuing delay (from June to November) and do not find any deliberate procrastination on the part of the Commonwealth.[13]

The progress of the motions Mr. Moldovsky filed followed a pattern similar to the trial date. The motions got separated from the trial itself and found their own way for a time in motions court.[14] The motion for allowance of funds for a private investigator was granted on June 13. We note in this regard that Mr. Moldovsky did in fact use the private investigator, but that the approval for such use, billed to the Commonwealth did not come until June 13, the day *after* the trial listing of June 12. Thus, Mr. Moldovsky could not possibly have been ready to proceed to trial on June 12, but would have required at least until the July 19 calendar listing to have the investigation

conducted and the results digested. We further find that the time the motion was pending before the court, from May 23 to June 13, was not unduly long. Mr. Moldovsky and the court records agree that the other motions were continued to July 17 on the motion of the Commonwealth, with the exception of the motion to suppress identifications, which was continued to trial, also on the motion of the Commonwealth. On July 17 the motions were continued to September 14 because the assigned assistant district attorney was ill, making the Commonwealth unprepared. On September 14 the suppression motion was continued to October 19 because the Commonwealth again was unprepared. The court records also show that Mr. Moldovsky was ill, but Moldovsky claims that that obviously was not the reason for the continuance, since he was in court that day. On September 15 there was argument on the discovery petition, which was then continued. On October 19 the hearing on suppression of statements was continued to November 15 by agreement of the parties and reunited with the trial listing in the homicide calendar room.[15] Mr. Moldovsky contends that the Commonwealth was unprepared at the October 19 hearing date.

Thus, by mid-October the two pending motions and the trial were jointly slated for November 15. The delays since Mr. Moldovsky's entry into the case up to this point seem to have been the result of a combination of defense and prosecution illnesses, vacations, and the bureaucratic snafu caused by calendaring motions in one courtroom with an assistant district attorney and judge who knew nothing about the case while the trial was calendared in another courtroom. Apportionment of responsibility for the delay during this period is mixed,

12. Mr. Moldovsky testified that he went to the hospital but was sent home when it was discovered he had phlebitis. He then returned to the hospital for the operation when the phlebitis cleared up. This scenario would consume more time than the operation and recovery ordinarily would.

13. While Mr. Moldovsky might indeed have been willing to handle minor matters during his

period of recuperation, we do not find it realistic that he was able then to handle a matter of the scope of the Boelter case, or that he would have so represented to the court.

14. See note 8, *supra.*

15. See note 8, *supra.*

but the Commonwealth must bear more than the relator.

On November 9, Mr. Moldovsky filed a formal petition for speedy trial under the applicable state rules, demanding dismissal or, alternatively, trial no later than December 4. This was the first formal petition and demand for speedy trial filed in this case. On November 15, the slated trial date, further argument was heard on pending motions in motions court, the motions were sent back to the homicide calendar room, and the trial was continued to November 27, "subject to call." On November 20, argument was held on the speedy trial motion and it was held under advisement. On November 22, the court denied the motion to dismiss but ordered that trial commence no later than January 8, 1973, after the Thanksgiving and Christmas holidays.

The case would have gone to trial by January 8, 1973, but Mr. Moldovsky objected to the assignment of the case to Judge Gutowicz, with whom he had had personality conflicts in the past. Fearing possible prejudice to his client, Mr. Moldovsky sought and obtained an agreement that the case would go to trial before Judge McDermott when that judge's current trial ended. At the end of January and beginning of February Mr. Moldovsky was out of town for a week or 10 days.

When it became apparent that Judge McDermott's schedule would not permit him to take the Boelter case, the case was reassigned, without prior notice to Mr. Moldovsky, to Judge Gutowicz for trial on February 5. Because of an ear infection, Mr. Moldovsky moved for a continuance to February 12, and then, in response to the unforeseen and unwelcome switch from Judge McDermott back to Judge Gutowicz, requested and was granted a continuance until February 26. On February 20, a second motion, under state rules, to dismiss for lack of a speedy trial was filed. This speedy trial motion was also denied, and trial commenced on February 26.

An overview of the time that Mr. Moldovsky was counsel for relator shows that of the slightly less than ten months involved, approximately five months of delay are fairly attributable to the defense. One month was due to the removal of Mr. Tinari, relator's prior counsel. Another month or more followed the grant of the motion for allowance of private investigator filed on behalf of relator. Defense counsel was indisposed due to his gall bladder operation for a month and one half in the fall. Finally, defense-induced delays from January 8, 1973, to the start of trial on February 26 resulted from defense counsel's ear infection and his ultimately unsuccessful attempt to get the case transferred to a judge other than one to whom it was originally assigned.

The five months or so of delay that is not attributable to defense activity is properly characterized as due to overcrowded dockets, staffing difficulties, and courtroom scheduling problems. There is no evidence of any intentional stalling for the purpose of gaining a tactical advantage.

From the time of arrest to ultimate conviction at the second trial, Mr. Boelter remained incarcerated. He was transported to each of his court appearances shackled at hands and feet, under armed guard, and accompanied by the blare of sirens. He wrote approximately 12 letters to his first attorney, Nino Tinari, requesting a meeting with him and an early trial date, despite having only a seventh-grade education and limited proficiency in reading and writing. He made no direct communications with the court.

## B. DISCUSSION

Our discussion of the Sixth Amendment right to a speedy trial must begin with the decision of the Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). In *Barker*, the Court adopted a "balancing test, in which the conduct of both the prosecution and the defendant are weighed," and which "necessarily compels courts to approach speedy trial cases on an *ad hoc* basis." *Id.*, 407 U.S., at 530, 92 S.Ct., at 2192. Four factors were identified as being among those which must be assessed in each speedy trial claim:

"Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* Boelter's claim must now be weighed in that balance.

### 1. Length of Delay

Length of delay, the first factor, serves primarily as a trigger for further inquiry, for unless there is some unusual delay, there is no need to inquire into the other factors that go into the balance. *Id.* at 530, 92 S.Ct. at 2191. Although the Court indicated in *Barker* that delay sufficient to provoke further inquiry would vary with the nature and circumstances of each case, *id.*, and although this case was a complex one that required more preparation and involved more witnesses and pretrial procedures than would the ordinary street crime, there is little question that the 25½ month delay endured by relator is presumptively prejudicial and requires that we carefully weigh the other factors.[16] *Compare, e. g., United States ex rel. Stukes v. Shovlin*, 464 F.2d 1211, 1214 (3d Cir. 1972) (14 month delay sufficient to warrant inquiry); *United States v. Diaz*, 535 F.2d 130, 132 (1st Cir. 1976) (14 month delay triggers inquiry); *with United States v. Wyers*, 546 F.2d 599 (5th Cir. 1977) (delays totaling 205 days between arrest and trial were *de minimis* and insufficient to trigger inquiry). The Court of Appeals for the District of Columbia Circuit has adopted a rule that delays of more than six months "are properly subject to inquiry and require justification," while a lapse of more than a year from arrest to trial endows a speedy trial claim with "prima facie merit." *United States v. Jones*, 524 F.2d 834, 849 (D.C.Cir.1975). We therefore proceed to consider the other factors identified in *Barker*.

### 2. Reasons for Delay

In assessing the reasons for the delay, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or over-crowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Barker v. Wingo, supra*, 407 U.S., at 531, 92 S.Ct., at 2193 (footnote omitted).

We have already found that relator and his counsel bear primary responsibility for the bulk of the delay during the sixteen months that he was represented by Nino Tinari, Esq. These delays were caused by fee disputes, Tinari's unpreparedness, and Tinari's unavailability. Crowded dockets and scheduling problems due to the policy of avoiding the sequestration of juries over the Thanksgiving or Christmas holidays were responsible for most of the remaining delays during Tinari's tenure as Boelter's counsel, although at least some of the delay was directly attributable to unpreparedness by the prosecution.

After Joel Moldovsky, Esq., had replaced Tinari, another ten months passed before Boelter's first trial. We find that about half of this delay was due to causes such as court congestion and staffing problems in the District Attorney's office. The remaining five months is attributable to the defense, including time spent by Boelter's new lawyer preparing for trial and litigating pretrial motions. The time attributable to the defense also includes about one and one-half months of defense counsel's illness, and one and one-half months of intentional defense delay for strategic purposes because of Moldovsky's desire to avoid trial before Judge Gutowicz. Thus, of the entire 25½ months of delay, well over half is attributable to the defense.

---

**16.** Both parties have treated the additional few months between the first and second trials as irrelevant to the speedy trial issue herein. We agree. Moreover, we do not believe that the inclusion of this period would mandate a result different from the one we reach. See note 18, *infra*.

The relator contends that because Tinari was appointed by the state to represent Boelter, the delay caused by Tinari should be weighed against the state rather than against the defense. In effect, relator asks that the state be made to bear the risk of prejudicial error whether that error is made by the prosecution or by appointed defense counsel. We do not think that a "heads I win, tails you lose" rule would be consistent with the Supreme Court's mandate in *Barker v. Wingo* that the conduct of both sides be weighed. And even if there are some cases in which such a rule of law might be appropriate, the case before us is not one. As we noted above, Boelter originally retained Tinari privately, and Tinari withdrew as retained counsel only because he was unable to reach an acceptable fee arrangement with Boelter's family. Four days later, Tinari was appointed by the court to represent Boelter. Thus, it is clear that Tinari's services were not imposed on an unwilling client. Instead, the state did no more than provide the means by which Boelter could continue to be represented by the lawyer he had chosen but could not pay. Under these circumstances, it makes little sense to weigh the delay caused by relator's appointed counsel against the government. *Cf. Ferri v. Ackerman*, 444 U.S. 193, 100 S.Ct. 402, 62 L.Ed.2d 355 (1979) (no federal immunity for appointed defense counsel in malpractice suit in view of, *inter alia*, Congress' attempt to minimize differences between appointed and retained counsel).

Nor is there any evidence that the state acquiesced in delay-causing conduct by defense counsel which the prosecution knew would prejudice the defendant. As the Court noted in *Barker v. Wingo*, delay can work to the advantage of the defense. 407 U.S. at 521, 92 S.Ct. at 2187. This may be especially true where, as here, the state depends on the testimony of eyewitnesses who may become unavailable or whose memories may fade.

Of the delay for which we have found the Commonwealth responsible, none was due to deliberate attempts by the prosecution to prejudice the defense or gain any tactical advantage by delaying the trial. Nor was any of the delay caused by the kind of valid reasons, such as missing witnesses, which would justify appropriate delay. Instead, the entire period of delay attributable to the Commonwealth was due to "more neutral reasons such as negligence [and] overcrowded courts." This delay, therefore, weighs against the state in the *Barker* balance, though not as heavily as it would had it been intentional.

### 3. Defendant's Assertion of His Right

The results of our consideration of this factor weigh in favor of relator, though not nearly so strongly as he contends. Boelter repeatedly wrote Nino Tinari, asking him to get the case moving forward and to come to meet with his client. However, it was not until January, 1972, when the case was a year old, that Tinari made what can only be described as perfunctory efforts to get the prosecution to bring his client's case to trial. Tinari's own unpreparedness during this time was the cause of substantial periods of delay. Relator's right to a speedy trial was formally though quite belatedly asserted by motion on two occasions—November 9, 1972, and February 20, 1973. However, it is clear that the state was making a substantial effort to bring Boelter to trial during this last period of the delay, and that the trial in fact would have commenced on January 8, 1973 but for defense counsel's efforts to secure the assignment of a different trial judge to his case.

### 4. Prejudice

Prejudice alleged to result from pretrial delay must be assessed "in the light of the interests of defendants which the speedy trial right was designed to protect." *Barker v. Wingo*, 407 U.S. 514, 532, 92 S.Ct. 2182, 2193, 33 L.Ed.2d 101 (1972). Identifying the relevant interests, the Supreme Court observed that the speedy trial right existed: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Id.*

There can be little doubt that Boelter experienced oppressive pretrial incarceration. He was confined continuously from his arrest on January 8, 1971, until his trial began on February 26, 1973—a period of twenty-five and a half months. During this time, Boelter left the jail only to go to court, shackled at hands and feet. However, we do not find that Boelter's defense was impaired at all by the delay. The only prejudice of this sort asserted by relator was the unavailability of Mr. Flood, the purported alibi witness, at trial. However, because Mr. Flood moved from the Gratz Street address just a month after Boelter's arrest, it is highly unlikely that he could have been found even had Boelter been tried promptly. Moreover, the notes of the detective who interviewed Mr. Flood show that Flood's testimony would probably not have aided the defense.

While prejudice to the defense at trial, the most serious of the three types of prejudice, see *Barker* at 532, 92 S.Ct., at 2192, is not present here, we note that such prejudice is not required for us to find that relator's speedy trial rights have been violated. See *Moore v. Arizona*, 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973). At our habeas corpus hearing, relator's able counsel made no attempt to demonstrate that substantial prejudice resulted from anxiety and concern attending the lengthy pretrial delay. Therefore, although Boelter must necessarily have suffered some anxiety and

concern while awaiting trial, there is no basis in the record for a finding that his anxiety and concern were so substantial as to contribute significantly to the balancing process here. Therefore, we give relator's pretrial incarceration substantial weight; prejudice due to anxiety and concern minimal weight; and prejudice to the defense at trial no weight at all.

### 5. The balance

In applying the *Barker* balancing test, we have been most troubled by the fact of relator's extended pretrial incarceration. At our invitation, supplemental briefs were submitted by the parties on this issue. While we decline the District Attorney's invitation to find that the prejudice suffered from pretrial incarceration is no more serious than the prejudice necessarily suffered by an accused who is released on bond while awaiting trial,[17] we must also reject relator's argument that incarceration for the period of delay involved here amounts to in essence a "per se" speedy trial violation.[18]

The *Barker* calculus is necessarily imprecise,[19] and this is an extremely difficult case in which to apply it. Our research and the research of the parties disclose several instances in which violations of the Sixth Amendment right have been found on the basis of facts which seem less compelling

---

17. The District Attorney's argument is based on the fact that a defendant released on bond pending trial may be subject to public scorn and will have difficulty finding employment, see *Klopfer v. North Carolina*, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967), and that anxiety and concern accompany any public accusation of criminality. See *United States v. Ewell*, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966). Moreover, there are substantial restraints on the liberty of an accused, even while released on bond. See *Moore v. Arizona*, 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973).

18. In weighing the prejudice suffered by relator, we have considered the period of pretrial incarceration both with and without the additional time between the two trials. Although the "weight" of the prejudice resulting from pretrial incarceration is thereby increased, the

difference is not sufficient to warrant a different result. And see note 16, *supra*.

19. In *Barker*, the Court described the right to a speedy trial as "amorphous" and "slippery." *Id.* at 522, 92 S.Ct. at 2187. Noting that "[a] balancing test necessarily compels courts to approach speedy-trial cases on an *ad hoc* basis, *id.* at 530, 92 S.Ct. at 2192," the Court stated that it regarded "none of the four factors . . . as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." *Id.* at 533, 92 S.Ct. at 2193.

than those presented here.[20] However, there are also many cases in which no speedy trial violations have been found, in spite of greater delay, and/or greater prosecutorial fault.[21] Indeed, we find a comparison to the facts of *Barker v. Wingo* itself to be a most instructive example of the proper application of the standards enunciated therein. The delay there was more than twice the delay in Boelter's case, and Barker was incarcerated for the first ten months of that period, yet relief was denied.

We have given substantial consideration to all factors identified as relevant in *Barker*. We have been greatly aided by the evidence adduced by able counsel at our hearing, and by the arguments presented by them. We weigh the factors as follows:

While the delay involved was significant, the bulk of it must be attributed to Boelter. Were it not for the time chargeable to him, the period of delay would not have been terribly long, given the complexity and importance of the case and the problems necessarily involved in getting it to trial.[22] The portions of delay not attributable to Boelter were either neutral or nonaggravated in character, due largely to the inability of the court system to efficiently process its staggering case load. Moreover, relator's

assertion of his speedy trial right was hardly a forceful one.[23] Finally, prejudice was either nonexistent or minimal, except with respect to the long pretrial incarceration, though, as we have noted, more than half of that time was the responsibility of the defense.

■ We have tried to consider these factors in a fair and reasonable light [24] against the factual background we have described and in light of the case law, which views the drastic remedy of dismissal with great caution. *See Barker*, 407 U.S. at 522, 92 S.Ct. at 2187. In such aspect, while the question is not free from difficulty, we conclude that, under the facts shown, Boelter's right to a speedy trial was not violated.

## III. THE CONFRONTATION CLAIM

### A. FINDINGS OF FACT

Relator's confrontation clause claim is based on rulings of the trial court which allegedly prevented his counsel from cross-examining a police witness concerning certain out of court identifications about which the officer had testified on direct examination.

Boelter was arrested on January 8, 1971, four days after the crime. That evening,

---

20. *See, e. g., United States ex rel. Mangiaracina v. Case*, 439 F.Supp. 913 (E.D.Pa.1977); aff'd without opinion 577 F.2d 730 (3d Cir. 1978); *United States v. Carini*, 562 F.2d 144 (2nd Cir. 1977); *Nocera v. Maryland*, 36 Md.App. 317, 374 A.2d 608 (1977).

21. *See e. g. Esperti v. Wainwright*, 447 F.Supp. 1289 (M.D.Fla.1978) (no speedy trial violation, although prosecutorial neglect was responsible for more than two years of a forty-three month delay during all of which defendant was incarcerated); *United States ex rel. Spina v. McQuillan*, 525 F.2d 813 (2d Cir. 1975) (twenty-six month delay due primarily to overcrowded court calendars did not violate speedy trial right); *Ricon v. Garrison*, 517 F.2d 628 (4th Cir.) *cert. denied*, 423 U.S. 895, 96 S.Ct. 195, 46 L.Ed.2d 127 (1975) (thirty-six month delay, where record was silent as to reasons, but where delay might have been caused by neglect or backlog, would not weigh heavily against the state); *Morris v. Wyrick*, 516 F.2d 1387 (8th Cir. 1975) (fifteen and one-half month delay, which state was unable to justify, did not automatically require habeas corpus relief).

22. We note the observation of the Supreme Court in *United States v. Ewell*, 383 U.S. 116, 120, 86 S.Ct. 773, 776, 15 L.Ed.2d 627 (1966) that "[i]n large measure because of the many procedural safeguards provided an accused, the ordinary procedures for criminal prosecution are designed to move at a deliberate pace. A requirement of unreasonable speed would have a deleterious effect both upon the accused and upon the ability of society to protect itself."

23. We have noted that relator had written to Tinari asking that he get the case moving and also that Tinari did not communicate with relator for some 16 months. Whether or not Boelter is chargeable with Tinari's neglect of his case (and we believe, at least for purposes of a speedy trial claim, that he is), in view of the fact that Boelter did not bring this state of affairs to the attention of the court, we are not convinced that Boelter was pressing is speedy trial right with any degree of vigor.

24. The actual *Barker* formulation affords no great guidance. *See* n. 19, *supra*.

he and three other suspects—Harry Allen, John Clark, and Darrel Jackson—were placed in line-ups supervised by police Lieutenant Bernard Margulis at Philadelphia's Police Administration Building. All four suspects were represented at the line-ups by Nino Tinari and his associate, Henry Lunardi. There were four separate line-ups, each containing, in addition to one suspect, five "fill-ins" selected from the individuals available—chiefly police officers or employees and those in police custody—with the aim of having an each line-up only people who bore a reasonable physical similarity to the prime suspect. Before any witnesses viewed the line-ups, counsel for the suspects had the opportunity to make or suggest changes in composition and arrangement.[25]

Seventeen people who had been present at Dubrow's viewed the line-ups.[26] Of these, seven identified Boelter in one way or another.

At the first trial, the Commonwealth called six witnesses who identified Boelter in court as one of the robbers. Five—Lucille Sachetti, Robert Porecca, Bernard Wagenheim, Joseph Ginsberg, and Audrey DiMeo—testified that they had also identified Boelter at the January 8 line-ups; the sixth, Barry Rosenthal, had not identified Boelter at the line-up. The Commonwealth also called Lt. Margulis, who described the line-ups and testified, without objection, to each identification of Boelter made at the line-ups, including those made by witnesses who had not yet testified.[27]

In his cross examination of these witnesses at the first trial Moldovsky attempted to show that some of the line-up identifications were tentative or that the same witnesses had made mistakes at other line-ups. On objection by the prosecutor, Melvin Dildine, the court limited Moldovsky's cross examinations in two respects: he was not permitted to cross-examine Lt. Margulis with respect to mistaken identifications made by William Dubrow, who had never identified Boelter and was not a Commonwealth witness; and his attempted cross-examination of Porecca and Wagenheim on mistakes they had allegedly made at the Sistrunk line-up the night before the Boelter line-up was ruled beyond the scope of the direct examination. However, the court gave Moldovsky leave to call Dubrow, Porecca and Wagenheim as defense witnesses to elicit any relevant information. The record of the first trial shows that the defense did, indeed, call Porecca, Wagenheim, Lt. Margulis, William Dubrow, Max Carson, and Clara Block, and that, through their testimony, he was able to show the jury more information bearing on the reliability of the line-up identifications.

After the first trial ended in a hung jury, Boelter was brought to trial again in July, 1973. Moldovsky's opening statement to the jury showed his expectation that the second trial would proceed substantially as the first one had, and he dwelt at some length on the role of identification testimo-

**25.** The record shows that this opportunity was exercised, and that, at Tinari's request, various changes were made.

**26.** The line-ups were conducted so that each witness would have no way of knowing whether earlier witnesses had made any identifications. Each witness was escorted by Lt. Margulis while viewing the line-ups, and was accompanied by both defense counsel and two assistant district attorneys.

**27.** The testimony was as follows:
[BY MR. DILDINE:]
Q. Now would you indicate to the Jury which witnesses identified Ronald Boelter at the stand-ups?
A. Mr. Boelter was identified by a Robert Porecca, Audrey DiMeo, Bernard Wagenheim, Joseph Ginsberg, Max Carson and Lucille Sac-

chetti. He was also picked out by two other witnesses, a Clara Block and a Max Carson as being closest to the suspect.
Q. Max Carson?
A. I believe so, yes.
Q. Will you refer to your memorandum?
A. Yes, sir. My memorandum—I marked down Louis Gruby, I believe, but I think I was in error on that. I think it was Max Carson.
Q. Very well.
A. Clara Block and Max Carson picked him out as being closest to the suspect, but they could not be sure.
At the time Margulis testified, Audrey DiMeo, Max Carson, and Clara Block had not been called to the witness stand.

ny and his anticipated attack on it, at one point describing mistaken identity as "the heart of our defense":

Now, Mr. Gelman gave you the names of certain people at Dubrow's. He said Mrs. DiMeo is going to identify Ronald Boelter and she absolutely positively identified Ronald Boelter. Well, ladies and gentlemen, Mrs. DiMeo is one of twenty-eight people who was there at Dubrow's and while Dubrow's has a few floors and while the twenty-eight people were scattered, most of them were on the first floor. While Mrs. DiMeo was at three different places on the first floor when she claims she saw Mr. Boelter, there were many other employees at those three places and we will present a number of people who were in the same position as she and we will ask them is Ronald Boelter one of the robbers.

.    .    ..    .    .

Now, I don't think anyone of the Dubrow employees is going to stand up and say, "No, he was not there." But you are going to find many who are going to look at him and say, "I don't know, I cannot identify him."

From the twenty-eight [victims in the store], four or five people make identifications in one degree or another and will say I'm absolutely positive. But wait until I get them on cross-examination. One of the things we are going to go into is the hat. You are going to be shocked to hear from one person that the hat that Ronald Boelter wore was a fedora hat with a wide brim, a floppy wide brim with a peak. You are going to hear from another person I expect to show that it was a sailor cap that the robber whom that person was robbed by identifies Ronald Boelter wore, a knit sailor-type cap, a cap that you fold up. You are going to still hear from another person who makes some type of identification that it was not a fedora type of hat and he wasn't bare-headed and it wasn't a sailor cap, but it was an ordinary hat, a businessman's hat. You are going to hear from one lady who made some tentative identi-

fication that although she only glanced at him, that he was a tall man, a tall man. That is, the robber, she now comes into court and puts her hand on the Bible and points to Ronald Boelter as being' she says he was the robber she is going to say he was a tall man."

.    .    .    .    .

Mrs. DiMeo says that the man whom she now identifies as Ronald Boelter did not wear a hat, that the robber whom she now identifies as Ronald Boelter on the three occasions when she saw that robber at Dubrow's in three parts of the store, one part in the center and then at two different positions in one of the back offices, she says that that robber whom she now comes into court and points out is Ronald Boelter, she says he did not wear a hat. Mr. Gelman will present three or four or five other people of the twenty-eight present who in one degree or another will tell you that Ronald Boelter absolutely for sure is the robber. And you will hear from all of those people that the man whom they think Ronald Boelter resembles, the robber whom they now identify as Ronald Boelter, you will hear from all of those people that he did wear a hat.

Now, something else very strange is going to come out. I promise that I will show you that one of the people who comes into the courtroom and points out Ronald Boelter and says, "He was one of the robbers," that this person only saw one of the robbers, only saw one, has always maintained he only saw one. There were eight robbers but I only saw one. And at the line-up, which took place on Friday, January 8th, 1971, four days after the occurrence, which was January 4th, 1971, he picked out two people.

.    .    .    .    .

Now, with regard to another witness, I will show you that at a prior proceeding he said he only saw one robber. But once it was elicited that he too had identified, had tentatively identified a policeman that night, and then he identified Ronald Boelter. He claimed at another proceed-

ing—he said I was wrong, I now claim I saw two robbers. But, of course, he denies that he identified other people.

Again, through the mouth of Lieutenant Margulis, through the documents that he recorded about what each witness saw, I will prove to you that that witness, if Mr. Gelman puts him on the stand to make an identification, that his identification is completely worthiess [sic], that it is mistaken, that he has identified other people, that he doesn't know for sure.

The presentation of the Commonwealth's case began with the testimony of two Dubrow's employees, a number of police officers, a fire marshal, and the medical examiner. Their testimony, which was not seriously challenged by the defense, established the basic facts of the robbery, arson, and murder. However, neither of these employees was able at any time to identify any of the robbers.

The Commonwealth then called Audrey DiMeo. She testified that as she was returning to her office after lunch, she came "face to face" with a man who was standing and examining a lamp. She then went into the office that she shared with Bernard Wagenheim and was immediately thereafter accosted by a man with a gun. Mrs. DiMeo then identified Ronald Boelter as the gunman, repeatedly testifying that there was "no doubt in my mind" that her identification was correct, and at one point saying that she was "Absolutely sure. There could be no mistake about it. I couldn't forget his face no matter how long I live."

Mrs. DiMeo was followed to the stand by Bernard Wagenheim. Wagenheim also identified Boelter and testified that he had

no doubt at all about his identification. The cross-examination and subsequent redirect and recross of Wagenheim brought out the fact that before identifying Boelter at the January 8, 1971, lineup as the robber, he had picked out two individuals at two other lineups as resembling or being similar in certain respects to the robber that he had seen. It is undisputed that Wagenheim only saw one of the robbers. At the request of the defense, a photograph of one of the other men whom Wagenheim had identified as being similar to the robber he had seen was shown to the jury so that they could determine the accuracy of Wagenheim's judgment that the other man resembled Boelter.

The Commonwealth then called Lt. Margulis, who had supervised the January 8 lineups. Lt. Margulis described the lineup procedures in considerable detail, and testified that one "fill-in" in the Boelter lineup—a police officer Hackett—was nearly identical to Boelter in both age and physical appearance, while the other four participants were somewhat younger and presented greater degrees of variance both as to hair length and skin color. Then, without any objection whatsoever from the defense, Lt. Margulis testified concerning the identifications made at each of the four lineups held that evening by each of the six witnesses who had picked out Boelter as either definitely being one of the robbers or as having some resemblance to one. This testimony was inadmissible hearsay, for it was offered to prove the truth of the matter asserted—that Boelter was indeed one of the robbers having been identified as such by a declarant who had not yet testified.[28]

---

**28.** It is clear that such testimony is objectionable in Pennsylvania. *See e. g., Commonwealth v. Billig,* 399 A.2d 735 (Pa.Super.1979) (error when, after two of five witnesses making in-court identifications were cross-examined as to inability to identify defendant from photo array, detective testified over objection that other three had made identifications from photo array); *Commonwealth v. Slaughter,* 482 Pa. 538, 394 A.2d 453 (1978) (police officer's testimony concerning out-of-court identification by person not a witness at trial was hearsay, but harmless beyond a reasonable doubt because the identification had first been brought to the

jury's attention by defense counsel's questions). *But see, Commonwealth v. Hill,* 237 Pa.Super. 543, 353 A.2d 870 (1975) (police officer's testimony concerning victim's identification of accused admissible, where victim himself testified and was available for cross-examination, even though victim had no recollection of having made identification). *Cf.* Fed.R.Ev. 801(d)(1)(C), which provides that a statement is not hearsay if the declarant testifies at the trial and is subject to cross-examination concerning the statement "and the statement is one of identification of a person made after perceiving him."

[BY MR. GELMAN (ASSISTANT DISTRICT ATTORNEY)]

Q. Who was the first one to see that Boelter line-up?

A. The first witness was Robert Porecca.

Q. And who was the second person to view the line-up?

A. Audrey DiMeo.

Q. Did Audrey DiMeo make an identification?

A. Yes, she did.

Q. Who did she identify?

A. The number five man, Mr. Boelter.

Q. Boelter was in position number five?

A. That's correct, sir.

Q. Did she equivocate at all in making her identification?

A. No, sir. She said Number 5 man.

Q. Who was the third person to view the line-up?

A. The third witness was Bernard Wagenheim.

Q. Who did he identify?

A. He picked out the Number 5 man.

Q. Was he positive in his identification?

A. Yes, sir.

Q. What, if anything, did Mr. Wagenheim do when he came to the Clark line-up?

A. He picked out the Number 3 man saying this man vaguely resembles one of the men in the holdup, as I recall.

Q. And you recorded that?

A. Yes, sir.

THE COURT: Which line-up was that?

THE WITNESS: The third line-up, sir.

BY MR. GELMAN:

Q. How many witnesses from Dubrow's viewed these four line-ups?

A. There were a total of seventeen witnesses on this evening, sir.

Q. Did Mr. Porecca make any identification, the first man to view the line-up?

A. Yes, sir.

Q. At which line-up did he make an identification?

A. The first line-up he picked out the Number 5 man.

Q. Who was that?

A. Mr. Boelter.

Q. Was he sure about his identification?

A. Yes, sir.

THE COURT: I'm sorry, I thought you said—are you talking about Mr. Porecca now?

THE WITNESS: Yes, sir.

THE COURT: I missed something. One of your former questions was did he make an identification? Now, was that line-up number one, are we still talking about line-up one?

THE WITNESS: Yes, sir. Line-up one.

THE COURT: So, Porecca did make an identification?

THE WITNESS: Yes, sir.

THE COURT: I didn't understand that. All right. I understood that Mrs. DiMeo and Mr. Wagenheim made an identification.

THE WITNESS: That is correct, sir.

THE COURT: But Mr. Porecca did also?

THE WITNESS: Yes, sir.

THE COURT: All right. Excuse me, counsel.

BY MR. GELMAN:

Q. Now, did there come a time during the line-up when Mr. Tinari and Mr. Lunardi requested that Mr. Boelter's position be changed?

A. Yes, sir.

Q. And was it changed as they requested?

A. Yes, sir. It was changed.

Q. And that was after how many people had viewed the line-up?

A. This was after the first five witnesses viewed the line-up that Mr. Tinari requested that Mr. Boelter be

changed from the fifth position to the first position.

Q. And was that done?

A. Yes.

Q. Do you remember where Mr. Hackett, the JAD officer, was positioned when they made their change?

A. Mr. Hackett remained in the Number 6 position.

Q. So, Mr. Boelter and Mr. Hackett now were each farthest apart from each other of the people in the line-up?

A. That's correct, sir.

Q. That was after you say five people had viewed the line-up?

A. That's correct, sir.

Q. Did Mr. Porecca make any other identification through the other line-ups, the Jackson, Clark, and Allen line-ups?

A. No, sir. He did not.

Q. Did Audrey DiMeo make any other identification through the other line-ups, the Jackson, Clark, and Allen line-ups?

A. In the Number 4 stand-up she picked out the Number 3 man as having seen him in Green's Drug Store.

Q. And that was the person who was familiar to her, but not involved in the holdup. She had seen him in the drug store?

A. (No response.)

Q. Did Lucille Sacchetti have occasion to view the line-ups?

A. Yes, sir. She did.

Q. And what number was she coming into the line-up?

A. What number witness was she?

Q. Yes.

A. She was the thirteenth witness.

Q. Did she have a comment about the line-up?

A. Yes. She picked out the Number 1 man, Mr. Boelter, as one of the men resembling one of the men in the holdup.

Q. She just said he resembled; is that correct?

A. That's correct, sir.

Q. How about Clara Block?

A. Yes. She was the fifteenth witness.

Q. Did she have a comment?

A. Yes. She picked out Number 1 man, Mr. Boelter, as looks like him.

Q. Did either of those two witness ever identify anybody else in the Jackson, Clark, and Allen line-ups?

A. Miss Sacchetti, no; Clara Block picked out the Number 3 man in the fourth stand-up as might have been, not sure.

Q. Who was that man?

A. The Number 4 man at the time she viewed the stand-up was a Larry Baegley.

Q. She was not sure and you didn't classify that as an identification?

A. No.

Q. Just a comment?

A. Her comment was might have been, but was not sure.

Q. Did Max Carson view the line-ups?

A. Yes, sir. He did.

Q. And at the time he viewed the line-ups what position was Mr. Boelter in?

A. Mr. Boelter was in the Number 1 position at the time Mr. Carson viewed it.

Q. And Officer Hackett was in what position?

A. Number 6.

Q. What did Mr. Carson have to say about the Boelter line-up?

A. He picked out both Number 1 and Number 6 as both of them looking good to him.

Q. Now, at the end of the line-ups—

THE COURT: Just a moment. At that time was number 6 still the police officer?

THE WITNESS: That's correct.

THE COURT: Hackett?

THE WITNESS: That's correct, sir.

BY MR. GELMAN:

Q. Now, at the end of the line-ups when the witnesses had seen all four line-

ups, did the defense attorneys have any comment to you?

A. Yes, sir. They indicated to me that they thought the stand-ups were all fair.

After the completion of Lt. Margulis' direct testimony, there was an exchange between defense counsel and the trial judge, Hon. Alexander F. Barbieri, in which Judge Barbieri ruled that Moldovsky would not be permitted to reserve a portion of his cross-examination of Lt. Margulis until after other witnesses had testified.[29] Then, while cross-examining Lt. Margulis, Moldovsky asked for the line-up sheets of the Clark, Allen, and Jackson line-ups. The prosecutor objected, and Judge Barbieri asked Moldovsky to explain the relevance of those line-up sheets in the Boelter case. The jury was then excused, and Moldovsky argued that the sheets of the other line-ups were relevant because Audrey DiMeo had picked out Darrell Jackson from the Jackson line-up "as someone who she was familiar with, that she had seen him in a drug store." Moldovsky argued that Jackson physically resembled Boelter, "I want them to see that she was familiar with Darrell Jackson and hence couldn't possibly have picked him out, but she did pick out Boelter. That's one of the purposes." Judge Barbieri then ruled that he did not understand the relevance of such evidence, and that Moldovsky would not be permitted "to cross-examine or bring into this case line-ups that do not include Mr. Boelter." The colloquy then continued as follows:

MR. MOLDOVSKY: Would you hear me a little more, please?

THE COURT: I will hear you, of course.

MR. MOLDOVSKY: Thank you. Now, for example, sir, William Dubrow. William Dubrow picked out Number 3 of the Jackson line-up, Darrell Jackson.

THE COURT: We are not trying Mr. Jackson.

29. The exchange was: MR. MOLDOVSKY: With the court's permission, I would like to cross-examine now, but I will have to reserve certain questions for later witnesses. But I would like to go on now.

THE COURT: You will call him as your own witness?

MR. MOLDOVSKY: Well, sir, Mr. William Dubrow picked out Number 2 of the Allen line-up.

THE COURT: We are not trying Mr. Allen.

MR. MOLDOVSKY: All right, sir. But Mr. Dubrow identifies people who were not charged who were not arrested. He obviously made a misidentification because if his identification were well taken, the people would have been arrested then. They would have been charged. And it is the very thrust of this case, of the defense, that there was a mistake in identification here. We give you another example, if I may, please?

THE COURT: You think it is relevant to show every time a person who is an identification witness has made a misidentification, you think that is relevant in your case?

MR. MOLDOVSKY: Where the people come in, for example, and let's take Barry Rosenthal. You will remember from him today—he's outside—I'm talking with respect to Barry Rosenthal. I can demonstrate it very clearly. Barry Rosenthal testified that he went to the line-ups and he made no identification and—

MR. GELMAN: He didn't testify.

THE COURT: Just a moment.

MR. MOLDOVSKY: I'm referring to the other trial.

THE COURT: Let me hear what he has to say.

MR. MOLDOVSKY: He made no identification at the line-ups, but lo and behold, Your Honor, he identifies Clifford Ballard out of the Allen lineup.

THE COURT: You can use that to contradict Mr.—

MR. MOLDOVSKY: As on cross, sir.
THE COURT: I don't think you can do that. You'd better get your cross-examination in now or you may call him as your witness. That's the way the law reads.
MR. MOLDOVSKY: All right, sir.

MR. MOLDOVSKY: Mr. Rosenthal.

THE COURT: Yes, Rosenthal. If he is called as a witness, yes. Unless you call him as your witness, then you cannot do that.

MR. MOLDOVSKY: Now, for example—

THE COURT: We are wasting a lot of time. I'm not going to allow you to go into line-ups having nothing to do with people who are not on trial here just simply to extend this record, because I think it is extensive enough, I think it is overextended.

. . . . .

MR. MOLDOVSKY: Now, where the defense is mistaken identification, if I cannot show that at other line-ups these witnesses who identified in one degree or another the defendant, also identified other people, whether it was a policeman or someone else, who wasn't charged, if I cannot show that, then I don't have the defense which is my only defense.

THE COURT: If that is your only defense, you don't have it. It's that simple.

MR. MOLDOVSKY: Respectfully, I take exception.

THE COURT: All right, of course. If you are going to show that ten years ago she misidentified somebody so now she is wrong about Boelter, if that is your argument—

MR. MOLDOVSKY: No, Sir.

. . . . .

I think if a person says I saw only one robber and then goes to the line-up and identifies in three different line-ups three different people, then I say that that person is impeached because I have shown that that person said—like the person said to day, on the stand, Mr. Wagenheim, that—

THE COURT: We are not going to allow or let you show misidentifications where Boelter is not involved. He is the only person on trial here. If they cannot identify Boelter, you will be able to present that to the jury. If

they can then that goes to the jury. But you are not going to have people that positively identify Boelter—you are going to attack them by failure to identify someone else?

Is that what you are going to do?

MR. MOLDOVSKY: Not at all.

THE COURT: Then I don't understand you.

MR. MOLDOVSKY: Mr. Wagenheim said he only saw one robber. He said it this morning. He said I saw one robber, and he said it this morning. Is that in your recollection? It is clearly in mine. Yet, he goes to three different line-ups, two on Friday night and one on Thursday night, and he makes three selections.

THE COURT: I heard his testimony and he didn't make three selections. That's what you keep saying, but he didn't.

Following the luncheon recess, there was a further discussion of the issue among the court and counsel, which unfortunately was not transcribed. However, an agreement appears to have been reached, and it was put on the record before the jury was recalled:

MR. MOLDOVSKY: In light of the fact that more identification witnesses are going to testify and that I will have questions of Lieutenant Margulis after they do, as soon as we go out in front of the jury I am going to say that I am reserving my cross-examination of Lieutenant Margulis until later in the day or tomorrow morning when the Commonwealth has presented whatever other identification witnesses it wishes.

THE COURT: Do you have any objection to that?

MR. GELMAN: I have no objection to that whatsoever.

THE COURT: Let the record also show that I have just explained my ruling to Mr. Moldovsky; that I feel that the complete procedures on line-ups, other than the one in which Boelter took part and has been identified, should not be brought in except as they can be used

in connection with the testimony of any particular witness who happens to be called. Very good use of this was used by Mr. Moldovsky in his cross-examination of Mrs. DiMeo, as I remember it, and this is perfectly proper in line with the ruling that I am making. Do you understand that, Mr. Moldovsky?

MR. MOLDOVSKY: Yes sir. I am agreeable to it.

THE COURT: Thank you, very much.

The jury was recalled, but without calling any other witnesses, the prosecutor rested:

MR. GELMAN: Your Honor, at this posture in the case we make available to Mr. Moldovsky Jennie Hillerstrom, Robert Porecca, will you stand up as I call you? Clara Block, Lucille Sacchetti, Joe Ginsberg, Barry Rosenthal, Max Carson, Anthony Palmucci. They are all present in the courtroom. Let the record reflect they are here and available to Mr. Moldovsky and we rest reserving our right to produce additional rebuttal testimony.

The defense then opened its case. Although Moldovsky called Boelter's original counsel, Mr. Tinari, in an effort to convince the jury that the line-ups were unfair and unreliable, he never called as witnesses the other Dubrow's employees who had made some identifications of Boelter, and he never recalled Lt. Margulis to the stand. However, in his closing statement to the jury, he argued that if other Dubrow's employees had been able to identify Boelter, "Mr. Gelman, who is a very able district attorney, would have put them on the stand so you could hear them identify him."

Not only did Moldovsky not call Margulis or the other identification witnesses to the stand, but he made no effort to challenge the evidentiary rulings which Boelter now claims foreclosed an effective exploration of the weaknesses in the identifications that those other witnesses would have made. He did not move for a mistrial, and did not ask Judge Barbieri to reconsider or modify his rulings.

## B.  DISCUSSION

As we noted in our initial Memorandum and Order, filed on October 6, 1976, the facts of this case raise serious questions of deliberate bypass and waiver as to the confrontation claim. Thus, our consideration of this issue must begin with a discussion of the opinions of the Supreme Court in *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), and *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), which hold that under certain circumstances failure to comply with state procedural requirements will provide an adequate state ground upon which the conviction might rest, thereby precluding federal habeas corpus review of the merits of a state prisoner's constitutional claim.

In *Fay*, the Court held that a constitutional claim that had not been resolved on the merits by the state courts because of a procedural default could nevertheless be reached on federal habeas corpus, although the district court was held to have discretion to deny relief "to an applicant who had deliberately by-passed the orderly procedure of the state court and in so doing [had] forfeited his state court remedies." *Id.* at 438, 83 S.Ct. at 849.

The rather broad standard articulated in *Fay* was considerably narrowed in *Wainwright*, where the Court held that petitioner's failure to comply with a state rule requiring contemporaneous objection to the proffered introduction of an inculpatory statement precluded habeas corpus relief on a claim that the statement was involuntary unless there was a showing of cause for the failure to object and actual prejudice.

The extent to which *Wainwright* overrules the more liberal standard of *Fay* is unclear. In a concurring opinion, Chief Justice Burger suggests that *Fay* will continue to apply in cases where the critical procedural decision is one entrusted to the defendant himself, *i. e.*, decisions, like the decision whether to waive the right to be represented by counsel or to take an appeal, which "involve the exercise of volition by the defendant himself with respect to his own federal constitutional rights." *Id.* at 92, 97 S.Ct. at 2509.

As we have noted above, relator's confrontation claim is based on rulings made by the trial court, which, on grounds of relevancy, prohibited defense counsel from cross-examining Lt. Margulis about misidentifications made at lineups not involving relator and apparently precluded the defense from calling the identification witnesses who had not yet testified and from attempting to weaken their identifications of Boelter by showing that they had made misidentifications at other lineups. As we have noted, these rulings were modified slightly when Judge Barbieri agreed to permit cross-examination of individual identification witnesses as to misidentifications they might have made at lineups in which relator did not appear. Presumably, once these witnesses had testified, the defense would then have also been able to cross-examine Lt. Margulis about these misidentifications and, indeed, counsel reserved the right to cross-examine Margulis until after the witnesses had been called. The court's modified ruling became moot, however, when the Commonwealth rested its case without calling any more witnesses.

The state court panel that considered relator's post-trial motions did not discuss the merits of the confrontation claim, holding that the issue had been waived because: (1) the defense never objected to Lt. Margulis' hearsay testimony regarding the other identification witnesses and lineups; (2) counsel cross-examined DiMeo and Wagenheim about the other lineups; (3) defense counsel proclaimed in his opening that the government would call four or five identification witnesses and told the jury what they would say;[30] (4) defense counsel expressly acquiesced to the preclusionary ruling of the trial court in its final form; (5) counsel did not seek reconsideration of the rulings when the prosecution unexpectedly rested its case without calling the other identification witnesses; (6) counsel did not call those other witnesses himself; (7) nor did he ask the court to call them; (8) the defense did not recall Lt. Margulis; (9) nor did counsel move to strike the hearsay testimony of Lt. Margulis.

Like the post-trial motions court, we think the conduct of defense counsel presents a classic example of waiver.[31] Following the initial procedural default—failure to object to the introduction of hearsay testimony concerning the lineup identification of witnesses who had not yet testified—as the opinion of the post-trial motions court suggests, counsel had numerous avenues open to him to correct the error or to mitigate whatever effect the evidence might have had on the jury. He chose to take none of these but instead to argue in his closing that had there been other witnesses who were able to identify Boelter, the Commonwealth would surely have called them.

We think the applicability of *Wainwright* under these circumstances is compelling, since the entire confrontation issue arose because of defense counsel's failure to object to the inadmissible hearsay.[32] We fur-

---

**30.** *See* text at 1159–1160 *supra. Inter alia,* counsel stated:

". . . Mr. Gelman will present three or four or five other people of the twenty-eight present who in one degree or another will tell you that Ronald Boelter absolutely, for sure is the robber. And you will hear from all those people that the man whom they think Ronald Boelter resembles, the robber whom they now identify as Ronald Boelter. . . ." N.T. Trial II 637–38.

Somewhat later in his opening, counsel continued:

"Now that it is the heart of our defense. From the twenty-eight, four or five people will make identifications in one degree or another and will say I'm absolutely positive. But wait until I get them on cross-examination." *Id.* at 639.

**31.** Under Pennsylvania law, contemporaneous objection is required to preserve an issue for appeal. *Commonwealth ex rel. Fox v. Maroney,* 417 Pa. 308, 207 A.2d 810 (1965); *Commonwealth ex rel. Mulleneaux v. Meyers,* 421 Pa. 61, 217 A.2d 730 (1966); *United States ex rel. Snyder v. Mazurkiewicz,* 413 F.2d 500, 502 n. 6 (3d Cir. 1969); *Commonwealth v. Clair,* 458 Pa. 418, 326 A.2d 272 (1974).

**32.** We focus on defense counsel's initial failure to object to the hearsay testimony because we believe that lapse without more is sufficient to bring the rule of *Wainwright* into play. We agree with the post-trial motions panel, how-

ther find that relator has demonstrated neither legally sufficient cause for the failure to object nor prejudice resulting from the admission of the evidence. Indeed, at the hearing we held on this matter, defense counsel stated that he was "tickled to death" when the Commonwealth elicited the inadmissible testimony from Lt. Margulis because he expected to make effective use of it on cross-examination. N.T. 148–50. Similarly, in his brief to the Pennsylvania Supreme Court on this issue, counsel stated *inter alia* that "no objection was made to what was elicited by the prosecution because it was the thrust of the defense that the unfair lineups had resulted in misidentification and that what each identification witness did at the various lineups would discredit the identification in court." Brief at 117. It is thus admitted that the failure to object was no mere inadvertence but was rather a tactical decision made by experienced counsel.

■ *Wainwright* makes clear that such strategic maneuvers on the part of defense counsel do not constitute cause sufficient to overcome the barrier of an adequate state procedural ground precluding federal habeas corpus review and further that a defendant will be bound by counsel's tactical decisions:

> In *Henry v. Mississippi*, [379 U.S. 443, 452, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965)], the Court noted that decisions of counsel relating to trial strategy, even when made without the consultation of the defendant, would bar direct federal review of claims thereby foregone, except where "the circumstances are exceptional."

> Last term in *Estelle v. Williams* [425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976)] the Court reiterated the burden on a defendant to be bound by the trial judgments of his lawyer.

*Id.* at 90 n. 14, 97 S.Ct. at 2508. *See also* concurring opinion of Chief Justice Burger. (Preservation of a claim arising from events that occur during the trial itself

> does not generally involve an assertion by the defendant himself; rather the decision to assert or not to assert constitutional rights or constitutionally based objections at trial is necessarily entrusted to the defendant's attorney, who must make on-the-spot decisions at virtually all stages of a criminal trial. As a practical matter a criminal defendant is rarely, if ever, in a position to decide, for example, whether certain testimony is hearsay and, if so, whether it implicates interests protected by the Confrontation Clause . . . .)

*Id.* at 93, 97 S.Ct. at 2509, concurring opinion of Mr. Justice Stevens ("The notion that a client must always consent to a tactical decision not to assert a constitutional objection to a proffer of evidence has always seemed unrealistic to me."). *Id.* at 94–95, 97 S.Ct. at 2510; concurring opinion of Mr. Justice White (although arguing for retention of the deliberate bypass standard of *Fay* rather than adoption of the new cause/prejudice standard:

> With respect to the necessity to show cause for noncompliance with the state rule, I think the deliberate-bypass rule of *Fay v. Noia* affords adequate protection to the State's interest in insisting that defendants not flout the rules of evidence. The bypass rule, however, as applied to events occurring during trial, cannot always demand that the defendant himself concur in counsel's judgment. Furthermore, if counsel is aware of the facts and the law (here the contemporaneous-objection rule and the relevant constitutional objection that might be made) and yet decides not to object because he thinks the objection is unfounded, would damage his client's case, or for any other

ever, that other decisions of counsel—particularly his failure to seek modification of Judge Barbieri's rulings when the Commonwealth unexpectedly rested, to recall Margulis, or to call the remaining identification witnesses himself—are also relevant to our finding of waiver and our conclusion that *Wainwright* controls

disposition of this claim. Although it might be argued that in light of Judge Barbieri's earlier rulings it would have been futile to seek reconsideration and that failure to do so cannot therefore amount to a waiver, we decline to grant habeas corpus relief because of a hypothetical ruling on an objection never made.

reason that flows from his exercise of professional judgment, there has been, as I see it, a deliberate bypass. It will not later suffice to allege in federal habeas corpus that counsel was mistaken, unless it is "plain error" appearing on the record or unless the error is sufficiently egregious to demonstrate that the services of counsel were not "within the range of competence demanded of attorneys in criminal cases." *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970).

*Id.* at 98–99, 97 S.Ct. at 2512. Thus, we think it clear that under *Wainwright* petitioner has not demonstrated sufficient cause for the failure to object to the evidence complained of and further that he is bound by what was clearly a tactical decision on the part of his counsel.

Finally, we note that relator has failed to show any prejudice resulting from the admission of the hearsay testimony. Defense counsel himself had referred to "four or five" identification witnesses in his opening statement to the jury, so that even without the testimony of Lt. Margulis the jury was aware that witnesses other than DiMeo and Wagenheim had identified Boelter. Similarly, Mr. Tinari, who was called by the defendant to testify to the unfairness of the lineup procedures, stated before the jury that of the nineteen people who had viewed relator, fifteen did not identify him, thereby establishing that at least four did. Furthermore, it is clear that the strongest identification testimony was that of DiMeo and Wagenheim, both of whom were cross-examined at length. In light of this damaging identification evidence, we think that the brief reference to the other identification witnesses was not prejudicial and added little to what was an already strong case for the Commonwealth.[33]

While we are satisfied that *Wainwright* is applicable to the facts of this case and believe that because petitioner has failed to

make a showing of either cause or prejudice we could properly decline to proceed further, we have nonetheless determined that, given the importance of the case and the length of time we have had the matter under advisement, a consideration of the substance of the confrontation claim may be properly undertaken. *Cf. United States ex rel. Gockley v. Myers*, 411 F.2d 216, 219 (3d Cir. 1969). (Circumstances, including the length of the time during which the district court has entertained a habeas petition warranted federal decision on an issue not presented to the state courts.) We therefore turn to a discussion of the merits of relator's confrontation claim.

Relator's confrontation claim rests not on the objectionable testimony elicited from Lt. Margulis concerning identifications of him made by witnesses who had not testified but rather on rulings of Judge Barbieri that limited the scope of defense counsel's cross-examination of Margulis and indicated that he would apply Pennsylvania's voucher rule should the defense call those identification witnesses himself.[34]

In claiming that these rulings amounted to error of constitutional dimension, relator relies on *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), which held that the application of Mississippi's voucher and hearsay evidentiary rules had produced a trial so unfair as to amount to a denial of due process. Boelter argues that factual parallels between his case and *Chambers* demand the same result here. In *Maness v. Wainwright*, 512 F.2d 88 (5th Cir. 1975), the court provided a concise summary of *Chambers*:

"Chambers was convicted of murdering a policeman who was killed in the aftermath of a barroom brawl involving a sizeable crowd. After Chambers' arrest, another man, Gable McDonald, made a confession to police which he later repudiated. At Chambers' trial, there was little hard evidence that Chambers had shot

---

**33.** In addition to the damaging evidence introduced in the Commonwealth's case in chief, the testimony of the defendant's alibi witnesses was effectively destroyed on rebuttal.

**34.** As noted *infra* at 1166, we are not convinced that Judge Barbieri did in fact express an intention to apply the voucher rule.

the officer, and part of Chambers' defense was to show that it was in fact McDonald who had committed the crime. Since the state did not call McDonald, Chambers had to call him as his own witness. He introduced McDonald's written confession, but on cross-examination by the state, McDonald repudiated it as having merely been part of a scheme initiated by one Stokes to get Chambers out of jail, whereupon they would all share in the proceeds of a lawsuit Chambers would bring against the city. Since McDonald had been called by the defense, he could not be cross-examined by Chambers' attorney under the Mississippi voucher rule . . . . . Furthermore, Chambers offered three different witnesses who would have testified that McDonald had admitted that it was he, not Chambers, who shot the officer. None of these three out-of-court confessions was allowed into evidence under the Mississippi hearsay rule which does not recognize admissions against penal interest as an exception to the hearsay exclusion. Thus the combined effect of the Mississippi hearsay and voucher rules prevented Chambers from introducing testimony which strongly implicated McDonald, rather than Chambers, as the guilty party."

*Id.* at 90. The Supreme Court did not articulate a rule for the application of the sixth and fourteenth amendments in *Chambers*. Instead, it decided that case on the basis of the totality of the facts presented.

■ We have carefully appraised the facts presented here. On the basis of that appraisal, which includes an independent examination of the record of Boelter's second trial, as well as consideration of the arguments of counsel and the evidence adduced at our habeas corpus hearing, we conclude that relator's constitutional rights were not violated. Among the more important factors contributing to this conclusion are the following.

First, we think it is significant that Judge Barbieri modified his initial ruling limiting the cross-examination of Lt. Mar-

gulis concerning misidentifications. Relator's counsel thereupon agreed with the modified ruling of the court that he could cross-examine as to events occurring at lineups other than the one in which Boelter appeared but only in connection with the testimony of individual witnesses who happened to be called and that he would reserve his cross-examination of Lt. Margulis until after the Commonwealth had presented the rest of its identification witnesses. This agreement clearly presumed that the other witnesses would testify, and there is no reason to believe that the court was any less surprised than defense counsel when the Commonwealth suddenly rested its case. Under those circumstances, we believe that Judge Barbieri would have permitted further and broader cross-examination of Lt. Margulis had it been requested. Moldovsky's decision at that time not to recall Lt. Margulis for further cross-examination may thus well have been, as the post-trial motions court concluded it was, a tactical decision made by experienced trial counsel.

We find no basis in the record for concluding that Judge Barbieri's rulings would in fact have prevented Moldovsky from calling Block, Carson, and Porecca (as he had done at Boelter's first trial) and also Sachetti, and showing, through their testimony, the alleged misidentifications. We think that relator misreads Judge Barbieri and attributes to him a harsher application of the "voucher" rule then he contemplated. *See* discussion *infra.* Concomitantly, relator ignores Judge Barbieri's receptivity to further argument on disputed points despite the fact that this record shows that even on points at issue here, he was willing to change his mind.

Although Pennsylvania had then and still has a voucher rule, historically it has not been rigidly applied. Six years prior to the trial at issue, in *Commonwealth v. Smith*, 424 Pa. 544, 548, 227 A.2d 653, 655 (1967), the Commonwealth's highest court approved a flexible approach to the voucher rule that had been articulated four years earlier by the Pennsylvania Superior Court:

While as a general rule a party who calls a witness represents him as being worthy of belief and cannot impeach him, this rule has been considerably relaxed to prevent injustice and the tendency of the Courts is to permit parties to show the truth without strict regard to technicalities.

In *Commonwealth v. Gee*, 467 Pa. 123, 354 A.2d 875 (1976), the court noted that "Pennsylvania Courts have frequently permitted parties to contradict or impeach witnesses called by them without a strict requirement of surprise when the interests of truth and justice seem to require it." Among the examples cited by the Pennsylvania Supreme Court in support of this statement were the *Smith* case, decided in 1967, and decisions of the Pennsylvania Superior Court in 1956, 1957, 1962, and 1964.[35] We do not believe that Judge Barbieri, a distinguished jurist who had earlier served on the Pennsylvania Supreme Court, was unaware of the relaxed approach to the voucher rule taken by the Pennsylvania courts. Moreover, the record in this case demonstrates that defense counsel was well aware of the scope of the rule.

The argument that Moldovsky would not have been permitted to bring out the misidentifications if he called the other witnesses to testify for the defense rests on a single exchange in the record where, discussing the testimony of Barry Rosenthal at the first trial, Moldovsky argued that he wanted to show that although Rosenthal made no line-up identification of Boelter, he did identify "Clifford Ballard out of the Allen line up." (Rosenthal was the only witness at the first trial who had made no line-up identification of Boelter but identified him in court.) Judge Barbieri responded, "you can use that to contradict Mr. . . . Rosenthal. If he is called as a witness, yes. Unless you call him as your witness, then you cannot do that." Clearly, the import of this ambiguous sentence in the "dry" record depends entirely on the oral emphasis supplied by Judge Barbieri. Since Rosenthal

had not been mentioned in Margulis' testimony, we think it more probable that Judge Barbieri was telling Moldovsky he would have to call Rosenthal if he wanted to introduce the alleged misidentification than that he was stating his intention to apply the voucher rule if the defense called Rosenthal (or any other identification witness).

We note further that to the extent that prejudice is a relevant concern in this context, see *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), the prejudice here was minimal, if in fact there was prejudice at all. Our findings of fact, *supra*, at 1157, demonstrate that the misidentifications by Porecca, Block, Sachetti and Carson were brought to the jury's attention at some length by defense counsel's opening argument. See *Commonwealth v. Slaughter*, 482 Pa. 538, 394 A.2d 453, 455-56 (Pa.1978). Moreover, upon direct examination Lt. Margulis testified to the non-identification and misidentification of other witnesses. Therefore, there is little room for doubt that the jury was aware at the close of the trial that four individuals who had not been called as witnesses had viewed the Boelter, Allen, Jackson, and Clark line-ups, had identified Boelter with less than complete confidence, and, in some cases, had made mistakes at one or more of the line-ups.

The contrast to the facts of *Chambers* is striking. In *Chambers*, the trial court's evidentiary ruling prevented the jury from ever learning that Gable McDonald had confessed that it was he who had committed the crime for which Chambers was on trial not once, but on four separate occasions. Instead, the jury heard only that McDonald had confessed and later repudiated his confession; Chambers' efforts to cross-examine McDonald in order to discredit McDonald's repudiation and alibi were barred on the basis of the voucher rule then in effect in Mississippi. The trial of Leon Chambers has been aptly described as "a palpable miscarriage of justice. The

**35.** *Commonwealth v. Bowers*, 182 Pa.Super. 628, 172 A.2d 806 (1956); *Commonwealth v. Bartell*, 184 Pa.Super. 528, 136 A.2d 166 (1957);

*Commonwealth v. Gurreri*, 197 Pa.Super. 329, 178 A.2d 808 (1962); *Commonwealth v. Staino*, 204 Pa.Super. 319, 204 A.2d 664 (1964).

state court had excluded evidence that strongly pointed the finger of guilt at Mc-Donald, while the evidence against Chambers was minimal. Furthermore, McDonald's inculpation spelled Chambers exculpation, since the state's evidence precluded the theory that more than one person was responsible for the killing." *Maness v. Wainwright, supra*, at 91.

On the other hand, this trial of relator was not such a miscarriage of justice. The rulings of the trial court challenged here did not exclude any evidence which could fairly be deemed "exculpatory." Nor did those rulings prevent or limit cross-examination which could have been needed to "test the conscience" of a witness whose testimony might have been untrue. Instead, the evidence which Boelter's jury did not get to hear was little more than cumulative, and no more than collateral. *See Commonwealth v. Slaughter, supra*, 394 A.2d at 457–58. There have been egregious cases in which the application of a state's rules of evidence resulted in trials so unfair as to violate the sixth and fourteenth amendments. *Chambers* was one of those cases, but this is not. The application of the voucher rule in this case—if, indeed, it was applied—may well have worked to Boelter's detriment, but the constitution has never guaranteed criminal defendants the privilege of bringing before the jury every shred of evidence that might suggest innocence or help to create a reasonable doubt as to guilt; where, as here, the voucher rule serves only to exclude matter tangential to the issues in the case and of questionable relevance, we do not believe a case for habeas corpus relief has been presented.

Nor are we able to find constitutional error in Judge Barbieri's limitation of the cross-examination of Lt. Margulis, even if we assume that he would not have relaxed his rulings after the Commonwealth unexpectedly rested. As the ninth circuit observed in *Skinner v. Cardwell*, 564 F.2d 1381, 1388–89 (9th Cir. 1977) (citations and footnotes omitted), *cert. denied* 435 U.S. 1009, 98 S.Ct. 1883, 56 L.Ed.2d 392 (1978):

The Sixth Amendment right to confrontation is embodied largely by the right to cross-examine adverse witnesses. . . . If the right to effective cross-examination is denied, constitutional error exists without the need to show actual prejudice. . . .

However, the defendant does not have the unrestricted right to cross-examine adverse witnesses on any matter desired. Initially the cross-examination must be shown to be relevant. The determination of relevancy is within the discretion of the trial court. . . .

Next, topics of inquiry which pass the relevancy hurdle are subject to the trial court's further discretion as to the proper extent of cross-examination. In *Alford v. United States*, 282 U.S. [687] at 694, 51 S.Ct. [218] at 220, 75 L.Ed. 624 the Supreme Court ruled:

"The extent of cross examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court. It may exercise a reasonable judgment in determining when the subject is exhausted." . .

Relevancy and the proper extent of cross-examination are closely interrelated. For example, a topic which is highly material deserves extensive cross-examination. But some topics may be of such minimal relevance that the trial court would be justified either in totally prohibiting cross-examination about them or in allowing only limited questioning. .

When, as in this case, the denied cross-examination relates to impeachment of a witness by proof of specific instances of past conduct relevant to credibility, the discretion of the trial court is further bolstered by Rule 608(b) of the Federal Rules of Evidence. . . .

The test for whether cross-examination about a relevant topic was effective, i. e., whether the trial court has abused its discretion, is whether the jury is otherwise in possession of sufficient information upon which to make a discriminating

appraisal of the subject matter at issue. When the refused cross-examination relates to impeachment evidence, we look to see whether the jury had sufficient information to appraise [the credibility of the challenged testimony].

Applying this language to the facts before us, we are convinced that Boelter was not denied effective cross-examination on relevant topics.

Indeed, "the trial court has a duty to control cross-examination to prevent it from unduly burdening the record with cumulative or irrelevant matter. . . . This duty includes a specific duty to prevent counsel from confusing the jury with a proliferation of details on collateral matters." *United States v. Weiner*, 578 F.2d 757, 766 (9th Cir.) *Cert. denied*, 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 651 (1978).

Our conclusion that *Chambers* does not require relief in this case is buttressed by a comparison to other cases which have applied it. *See, e. g., Lipinski v. New York*, 557 F.2d 289 (2d Cir. 1977); *Maness v. Wainwright, supra. Compare, Welcome v. Vincent*, 549 F.2d 853 (2d Cir. 1977) (Chambers extended to situations in which the application of the voucher rule alone is involved, but only to "rare situations . . . where another person, present on the witness stand, has previously confessed that he, rather than the defendant on trial, has perpetrated the crime."). In short, while *Chambers* may well mandate the grant of relief in cases which do not present as serious a miscarriage of justice as occurred in *Chambers* itself, we do not believe that the rule of *Chambers* should be extended to control this case. Finally, we note once again that the rulings complained of were essentially of defense counsel's own making, for it was his tactical decision not to object to the hearsay identification testimony of Lt. Margulis that caused the rulings to be made. We decline to grant habeas corpus relief because of a strategic maneuver that failed.

An appropriate order follows.